STATE OF MAINE

KENNEBEC, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-03-156
DHM - KEN-9/24/2003

DIRIGO HOUSING ASSOCIATES, INC.,

Plaintiff

v.

CHRISTOPHER CROWLEY and
CATHERINE WHITNEY,

Defendants

ORDER ON MOTION FOR
PRELIMINARY INJUNCTION

DONALD L. GARBRECHT
LAW LIBRARY

OCT 7 2003

This matter is before the court after hearing on plaintiff's motion for preliminary injunction. A motion for temporary restraining order was previously denied with hearing on preliminary injunction held in an expedited manner.

Plaintiff, Dirigo Housing Associates, Inc. (Dirigo), is a Maine corporation with an office in Augusta, Maine. It is a real property management organization providing maintenance, management and administrative services to clients, owners of real property rental facilities. Most, if not all, of the clients receive governmental subsidy in some form. Its president and sole shareholder is Robert A. Tisdale, a resident of Sarasota, Florida. The plaintiff has been in business since 1980. During calendar year 2003, the corporation had over 23 clients involved with 27 facilities.

Defendant Christopher Crowley was hired by the plaintiff on October 24, 1986. His position was vice-president of operations where he was responsible for operations, personnel and maintenance. Mr. Crowley started his career in August of 1975 with the Auburn Housing Authority and is now CEO of C & C Realty Management.

Defendant Catherine Whitney was hired on November 13, 1985. She was vice-president of finance and co-director of operations. She started her career in 1975 with

the Maine State Housing Authority and is now associated with Mr. Crowley and C & C Realty Management.

Since the early 1990's, Tisdale has been an absentee owner and president relying upon the defendants for the day-to-day operations of the corporation. He resides in Florida, visits Maine occasionally and has other business interests. He has had no personal relationships with clients of Dirigo while the defendants have maintained close relationships with the clients communicating regularly, attending regular board of directors meetings and providing ongoing management advice. The corporation has been maintaining a "draw" account for the benefit of Mr. Tisdale from which he has drawn the net proceeds of the operation of the company.

For a period of time, Mr. Tisdale has had a disagreement with the Maine Revenue Service. This resulted in a payroll levy by the Maine Revenue Service in 2002 on Dirigo in accordance with 36 M.R.S.A. § 176-A. This was ultimately rescinded by the Maine Revenue Service. In late Fall of 2002, the Maine Revenue Service served a second levy in accordance with statute, in this case addressed to "accounts payable." Shortly thereafter, the defendants were instructed by Tisdale to cease making entries in the draw account but to create a payable account to a Florida management corporation as Mr. Tisdale wished it to provide management and consulting services to Dirigo and deal with his income issues with the State of Florida. This was not a new concept on the part of Tisdale as he had been, upon professional advice, considering such a move during previous years. However, the defendants became concerned that this change in accounting practices as well as the payments would be perceived by the Maine Revenue Service as a violation of the levy.[1] Mr. Tisdale testified that he was advised by Maine

---

[1] During the proceeding, the court took notice of 36 M.R.S.A. § 184 which provides criminal penalties to be imposed against any officer, agent or employee of a corporation who is responsible for the control and

2

counsel that undertaking such a change of procedure under the circumstance would be a "gray" area. The defendant, Whitney, consulted with plaintiff's corporate accountant and attorney for advice in the matter. Indeed, it was a area of legitimate concern. Since the levy was addressed against the accounts payable of Dirigo and, at the time of the levy, there apparently was no due payable to Mr. Tisdale, he took the position that the use of the Florida management corporation would only apply to future consulting fees and would not be in violation of the levy. The defendants were not so sure.

Upon complaint by Whitney of her personal exposure to these circumstances, Tisdale promised that he would change her working conditions and job description so that she would not be an officer responsible for these payments. Whitney and Crowley interpreted Tisdale's comments to mean that Whitney would be demoted if she did not follow Tisdale's plan. While Whitney did see to a single entry under Tisdale's new process, she refused to make any further entries and did not participate in any payments to Tisdale's Florida corporation. Nevertheless, this created an environment of severe dispute between two long-term officers and employees of Dirigo and its owner. This resulted in defendants Crowley and Whitney advising Tisdale that they wished to cease their employment with Dirigo and form their own realty management business. In accordance with that desire, they entered into negotiations with Tisdale to purchase his client contracts. Tisdale proposed that the defendants purchase the Dirigo corporation by purchasing all of its stock, purchasing its contracts, keeping the office facilities and retaining all employees. The defendants' counter-proposal was to simply purchase certain contracts. Because the parties were too far apart as to the amount of consideration for the transaction, they ceased negotiations.

management of the funds and finances of that "person" and who intentionally fails to collect or truthfully account for or pay over the tax required by the State of Maine.

3

In May of 2003, Crowley advised Tisdale that he was leaving Dirigo effective August 1, 2003, to form his own realty management company. During the same month, Whitney also advised Tisdale of her intent to leave but at that time she was unsure of her future plans and she was still considering whether to join Crowley in his new venture.

As of May of 2003, Crowley had been operating under a written employment contract which contained a "piracy" or noncompete provision prohibiting any competition or solicitation of competitive business while employed for Dirigo. Whitney had no such contract but both Crowley and Whitney had received an employee handbook in February of 2003 which contains a provision on conflict of interest recognizing the right of employees to engage in activities outside of their employment but requiring full disclosure of such employment to plaintiff and a requirement that an employee must provide a written notification of planned outside work so that an officer of the corporation could determine whether a conflict may arise. The defendants and Tisdale were the only officers of the corporation.

Once the decision had been made in May to leave Dirigo and form his own business, Crowley followed his systematic working relationships with the company's clients and proceeded to notify them that he was leaving the company. However, in the course of notifying some clients, Crowley also disclosed that Tisdale was having "financial" difficulties and, in some cases, disclosed that Tisdale had "tax" difficulties. While there is no evidence that he directly told any of the clients that Tisdale was incapable of continuing to serve them, the clients certainly reacted by suggesting that they would not be comfortable remaining with Dirigo but wished to terminate their relationship and proceed with Crowley in his new endeavor. Crowley made it clear to the clients that he could not solicit their business while he was still employed by Dirigo

and would not even answer their questions to assist them in terminating the Dirigo contract but he did advise that they should feel free to contact Whitney should they have any questions. Whitney also advised clients that she was leaving the company and while there is no evidence that she disclosed details as to Tisdale's financial or tax situation, the clients who had a daily working relationship with her also expressed a desire to stay with her services. In both cases, Whitney concluded that it was within her responsibilities as an employee of Dirigo servicing the clients to assist them in termination of their contracts. In response to requests from the clients, she prepared a draft letter of termination and sent that draft to clients with a cover letter explaining that this was the method that they could use to effectuate their termination of their relationship with Dirigo. As a consequence, in the latter part of June, 2003, Mr. Tisdale starting receiving a number of termination letters from clients of Dirigo very similar, if not almost identical, in content and style. Since he had not been told by either Crowley or Whitney that the clients were seeking to leave Dirigo and remain with the services of the defendants, Tisdale confronted the defendants. Upon being advised of their efforts, he immediately fired them effective July 1, 2003.

Nine management agreements were admitted as exhibits. The two earliest agreements are identical in termination language and the six latest agreements are identical in termination language. A contract of 1995 has unique language. The agreement between Maine Avenue Manor, Inc. and Dirigo Housing Associates was effective January 1, 1987. The agreement between Augusta Regional Church Housing Corp. and Dirigo Housing Associates was effective July 1, 1986. Both agreements were for a term of one year. The provisions relevant to this proceeding read as follows:

15. Term. . . .

(a) . . . .

5

(b)     This Agreement may be terminated by mutual consent of the Developer *or* the Agent as of the end of any calendar month, provided that at least thirty (30) days advance written notice thereof is given to the Authority.[2]

(c)     . . . .

(d)     . . . .

(e)     . . . .

(f)     Subject to termination as provided in paragraph 15(b), this Agreement is automatically renewal on a yearly basis until such time as Developer or Agent notifies the other in writing at least thirty (30) days prior to a change or termination of this Agreement.

The management agreements of Augusta Regional Church Housing Corp. Beta with Dirigo Housing Associates was effective May 1, 1995. That termination reads as follows:

15.     Term.

(a)     . . . .

(b)     This Agreement may be terminated by the Developer or the Agent as of the end of any calendar month, providing that at least sixty (60) days advance written notice thereof is given to the other party and HUD, or by mutual consent of both parties by providing at least thirty (30) days advance written notice thereof.

(c)     . . . .

(d)     . . . .

(e)     . . . .

(f)     Subject to termination as provided in paragraph 15(b), this Agreement is automatically renewable on a yearly basis until such time as Developer or Agent notifies the other in writing at least thirty (3) days prior to a change or termination of this Agreement.

The management agreements of Dirigo Housing Associates with Lewis Jones Apartments, Beechwood Apartments, Broadway Meadows, Waldoboro Woods,

---

[2] The court notes the language is contradictory and ambiguous. In order for consent to be mutual, it must include both the developer and the agent, not the developer _or_ the agent.

Harborside Apartments, and John Carver Apartments are all dated January 1, 2001, and each have a term of three years from that date. The termination provisions in those agreements read as follows:

    25.    <u>Term of Agreement</u>.

        (a)    . . . .

        (b)    This Agreement may be terminated by the mutual consent of the Principal Parties at the end of any calendar month, provided that at least thirty (30) days advance written notice thereof is given to Rural Development. . . .

        (c)    . . . .

        (d)    . . . .

        (e)    . . . .

        (f)    . . . .

        (g)    Subject to termination as provided in this paragraph, this Agreement is automatically renewable on a yearly basis until such time as Owner or Agent notifies the other in writing at least thirty (30) days prior to a change or termination of this Agreement, or thirty (30) days prior to the annual renewal date.

Termination notices in evidence received by Mr. Tisdale were from Biddeford Associates on behalf of Forest Green Apartments, Rangeley Housing Development Corp., Bruce Laukka on behalf of Broadway Meadows, Beechwood Apartments and Lewis Jones Apartments, James Davidson on behalf of Waldoboro Woods, Harmon Harvey on behalf of ARCH Alpha Apartments and ARCH Beta Apartments, Dean Beaupain on behalf of Maine Avenue Manor, Inc., and Henry Hopewell on behalf of Harborside Apartments and John Carver Apartments. Tisdale, relying upon the language of Dirigo's agreements, refused to consent to the termination of Harborside, Maine Avenue Manor, John Carver Apartments, Beechwood Apartments, Broadway Meadows, and Lewis Jones Apartments. Therefore, Dirigo continues to handle the

7

management of those facilities. While the court is unclear as to the status of the contracts with the Rangeley Housing Corp. and Forest Green Apartments, it would appear that Mr. Tisdale has allowed termination of those contracts. The plaintiff is still currently managing the ARCH Beta Facility per its agreement but at the time of hearing, acknowledges that it was within the 60-day notice period. Plaintiff considers the obligation of ARCH Alpha contract to continue to June 2004.

At the present time, the defendants own and operate C & C Realty Management performing the same services while employed by Dirigo. The clients under contract to Dirigo were wholly dependent upon the defendants for management, maintenance and administrative services. Regardless of any disagreements between the defendants and the plaintiff, they have clearly expressed a desire to maintain the service relationships provided by defendants. In some cases, this is a crucial time for the clients because they are engaged in such activities as budgeting for forthcoming year, refinancing and other important decisions wholly dependent upon their management firm.

The plaintiff is the corporation wholly owned by Mr. Tisdale. Mr. Tisdale through his corporation seeks to have the court enjoin the defendants from reaping the benefit of their termination on the grounds that the defendants intentionally and willfully caused the clients to believe that the corporation would not be able to provide the services after the defendants left the employ, that this was the result of personal financial and tax difficulties on the part of the president of the corporation and they assisted the clients in their termination, in some cases in violation of their contracts, in order to take the business away from the plaintiff. This extraordinary equitable relief is founded upon allegations that the defendants' deliberately solicited the business of clients by their disloyal activities, breaching their duties of trust to the plaintiff, and conducting all activities while still employed by the plaintiff. In support of that

allegation, the plaintiff stresses that at no time did the defendants advise Mr. Tisdale that they were engaged in such activities until Mr. Tisdale had received letters of termination from the clients.[3]

Plaintiff believes it will suffer irreparable injury in the destruction of its business in the event the defendants are successful in overtaking contracts representing 48% of the total gross income as presented in a 2003 calendar/fiscal year budget. Examination of the direct evidence based upon that budget reveals that this includes clients to whom plaintiff has refused termination under the terms of the contracts and is still providing services in accordance with the terms.

During the time of his employment with the plaintiff, Crowley created a nonprofit corporation utilizing the resources of the plaintiff including the payment of all costs in the formation of the corporation. Its purpose is to provide a vehicle to purchase housing for low-income elderly and to provide an additional client for the plaintiff to provide management services. Prior to the termination of his employment, Crowley facilitated the offer of an option contract to one of plaintiff's existing clients which option is still outstanding. The intent is for the nonprofit corporation to purchase the facility and plaintiff to manage it. During the course of activities which are complained of by the plaintiff, the owner of the facility negotiated directly with Crowley for that purpose and some discussion took place with regard to whether Crowley and C & C Realty Management would enter into a contract with the nonprofit corporation for real estate management.

A vice-president of a corporation is an officer of the corporation and an employee. As such, the employee owes his or her employer a fiduciary duty. That duty

---

[3] Plaintiff is also seeking damages for plaintiff's losses as a result of defendants' conduct but that matter is not now before the court.

is founded upon a covenant of good faith and fair dealing requiring that the parties not conduct any activities that will injure the right of the other to receive the benefits of their employment agreement. In the absence of specific written understanding, an officer is subject to a duty not to compete with his or her corporation concerning the business of the corporation. In the absence of an employee agreement or even of an employee handbook representing the terms of employment, it is good law that an employee who is making preparations to compete after termination of his employment may advise the current customers that he is leaving that employment but he or she cannot solicit that future business prior to termination. The terminating employee cannot use confidential information peculiar to his employer's business, he cannot solicit customers or do other acts in direct competition with his employer even though upon termination, he or she can immediately engage in competition. *See McAllister v. Kastella,* 825 P.2d 980 (Ariz. 1992).

It is fundamental that equitable relief in the form of an injunction is an extraordinary remedy only to be granted with utmost caution and only when justice urgently demands it and the remedies at law fail to meet the requirements of the case. An injury for which there is no adequate remedy at law is an irreparable injury. *Bar Harbor Banking & Trust Co. v. Alexander,* 411 A.2d 74 (Me. 1980). Interference with a contract or an advantageous relationship arising out of an agreement is actionable at law and the law provides damages to those who would cause such interference. There are, however, some times circumstances in which the impact of the interference so drastically injures a business enterprise that money damages are not deemed to be adequate and injunctive relief is available. This is particularly true when the facts cause the court to conclude that there is no real way in which the business can recover the market in the future. *See Wilson v. Harrisburg,* 107 Me. 207, 77 A.2d 787 (Me. 1910).

10

Where economic damages are the injury relied upon, that economic harm, in and of itself, is not sufficient to constitute irreparable injury. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against the claim of irreparable harm. Speculative injury does not constitute irreparable harm and conjecture about a possibility of difficulties with damage computation is inadequate to support an injunction. *Merrill Lynch Pierce Fenner & Smith v. Bishop*, 839 F.Supp. 68.

The defendants have the right voluntarily to terminate their relationship with the plaintiff and to enter into a competing enterprise without penalty. Because of the strong personal relationships in the nature of the services they were providing to the clients, they had an obligation to advise the clients as soon as the decision was made and notice was given to their employer. They had a duty both to their employer and their employer's clients to assist both in orderly transition procedures attendant to their leaving. In receiving such information, the clients were fully within their rights to take advantage of the terms of their contract and transfer their business from the plaintiff to the defendants as long as it was done consistent with the terms of the management contracts. Had that, and nothing more, been done in this instance, the plaintiff would have no claim. It is defendants' position that this scenario is precisely their activities during the periods of June 2003. However, that is not what happened.

For reasons best known to themselves, the defendants, particularly Crowley, determined to advise the clients of a deficiency in the plaintiff, and circumstances raising doubts as to the future capabilities of the plaintiff and its owner in performing under the contracts upon the departure of the defendants. The defendants have not really explained their motive for such disclosure and it leaves the court with an inference that they were doing so out of feelings of animosity toward Mr. Tisdale when

11

he was seeking to cause the defendants to engage in activities which they believed to be illegal or unethical. Indeed, the evidence appears that Whitney advised one or more clients that she had been asked by the president to undertake illegal or unethical conduct while Crowley was more specific in relating to the financial and tax difficulties of the principal shareholder. Were the court to have any doubt about the proper intent of the parties in making such statements, it is dispelled by the fact that the defendants did not tell Mr. Tisdale that the clients were seeking to terminate their contracts and continue with the defendants and that they were assisting the clients in that termination effort by providing draft documentation for notice purposes. Further, it would appear that it was done without regard to the terms of the existing management contracts, most of which have at least five months to run before a termination date.

There is no direct evidence of solicitation by the defendants but it is clear that they created a hostility on the part of the clients toward their management contracts with the plaintiff. This is evidenced by those clients who have expressed a desire to terminate their contracts with Dirigo but who indicate they are undecided as to whether they will engage in a contract with defendants or go elsewhere. In other words, it is clear that their decision to terminate is based upon a desire to leave a relationship with Dirigo rather than initiate a new relationship with defendants. However, such interference is actionable at law for which there are remedies. The issue is whether or not these terminations occasioned by the misconduct of the defendants are of such a magnitude that they effectively destroyed the business of Dirigo from which it cannot recover and therefore to which it is entitled to equitable relief.

Mr. Hopewell is the developer of Harborside Apartments and John Carver Apartments. A letter of termination was sent but rejected by the plaintiff. Harborside contracts are dated January 1, 2001, with a term of three years subject to termination

12

only with mutual consent or thirty days notice prior to the end of a term and otherwise renewable annually. Plaintiff is still servicing that contract. There is no evidence that defendants communicated their issues with Mr. Tisdale.

Mr. Beaupain is the developer of Maine Avenue Manor. That contract is dated January 1, 1987. A letter of termination was sent. It, too, contained a requirement of termination by mutual consent or thirty days prior to end of the yearly term, otherwise annually renewable. The termination was rejected and plaintiff is still managing the facility. There is no evidence of communications by defendants of Mr. Tisdale's issues.

The Rangeley Housing Development Corp. was advised by defendants that Mr. Tisdale had problems with the Maine Revenue Service. Its Board of Directors discussed Mr. Tisdale's problems when it voted to terminate the contract, indeed, its minutes disclose "major stockholder of Dirigo is in trouble with IRS." The contract is not in evidence but it was terminated. Plaintiff's 2003 budget represents a $53,940 revenue anticipated from that contract.

Mr. Laukka is the developer of Broadway Meadows, Beechwood Apartments, and Lewis Jones Apartments. He had a very personal relationship with defendant Crowley and, indeed, contracted with plaintiff as a result of the efforts of defendant Crowley. He sent a letter of termination to the plaintiff with intent to change his contract to another, not the defendants, but did ask for assistance from defendant Whitney in the termination. Those three contracts are under date of January 1, 2001, with a three-year term. They, too, require mutual consent or thirty days notice prior to the end of the term for termination. Plaintiff did not consent and is still serving those facilities.

Mr. Rowe is the developer of Shadagee Elderly Housing. Mr. Rowe had only been told by defendant Crowley at a board meeting that Mr. Tisdale "had problems."

13

plaintiff was dated January 1, 2001, with a three-year term requiring mutual consent or 30-day notice prior to the end of the term to terminate. The present status of the contract is unclear. The nonprofit corporation clearly is property of the plaintiff by being created through the resources of plaintiff and efforts of defendant Crowley while an employee of plaintiff. If the option is exercised, defendant Crowley has presented no legal basis upon which he can usurp plaintiff's position vis-à-vis Waldoboro Woods. It would appear that plaintiff continues to service the contract.

Mr. Harvey is a member of the Board of Augusta Regional Church Housing. It has two projects known as ARCH Alpha and ARCH Beta. He testified that he was advised by defendant Crowley by a telephone call that there were personal difficulties of Mr. Tisdale that might affect the operation of Dirigo Housing Associates. He mentioned that there were tax problems. Subsequently, Crowley advised Harvey that he was leaving plaintiff's employ. Harvey's concern was that the Housing Corporation's relationship with Dirigo was exclusively with the defendants and he had discussions with defendant Crowley as to changing the management from Dirigo to the defendant. Without meeting with the Board, Harvey sent a letter of termination. The ARCH Alpha management agreement is dated July 1, 1986, for a term of one year. It has terms for termination of mutual consent or 30 days notice prior to the end of the term with automatic annual renewals. The ARCH Beta agreement is dated May 1, 1995, with language unique from the other contracts. This termination provision says that either party may terminate upon 60-day notice or by mutual consent with 30 days notice. It also provides for an automatic renewal unless there is 30 days notice prior to termination of a term. Relying upon the contract, the plaintiff has made clear that it does not consider there to be a valid termination of ARCH Alpha until June of 2004, i.e., 30 days notice prior to the end of the one-year term. At time of hearing on this matter,

15

The board decided they would be "voting for Chris" and terminated. That contract is represented in plaintiff's 2003 budget of anticipating generating revenue of $51,178.[4]

Mr. Jenny is the developer of Biddeford Associates in a project known as Forests Green. He was advised by defendant Crowley of his intent to leave the plaintiff's employ. In this case, Crowley is quoted as advising Jenny that he "wanted to be a principal" of the plaintiff corporation and failing that, was leaving to form his own realty management corporation. This appropriate rationale as expressed to Jenny left the witness with a loss of defendant Crowley as a manager. After consulting with his accountant, with his "authority" (HUD) and others, he terminated the contract with plaintiff. During the notice period, he had an experience with Mr. Tisdale which Mr. Jenny considered unsatisfactory. He testified he paid the plaintiff service fees for an additional month in order to terminate the agreement. Loss of revenue as proposed by the 2003 budget is $42,868.

Mr. Davidson is the developer of Waldoboro Woods. Mr. Davidson also was involved with receiving an option to purchase from HELPME, the plaintiff's nonprofit corporation. When Mr. Davidson was advised by defendant Crowley of his intent to leave the plaintiff's employ, he determined that he could work with either the plaintiff or defendant Crowley but preferred to work with defendant Crowley. Having decided that he would terminate his contract, he received, unsolicited, a copy of a proposed termination letter from defendant Whitney. Davidson had previously considered the sale of the development to HELPME, the nonprofit corporation. His contract with

---

[4] The court understands this development is in the Town of Phillips. An employee/receptionist of the plaintiff testified that prior to a meeting "in Phillips" defendant Crowley made remarks suggesting improper conduct and upon complaint by the receptionist Crowley responded, "You ain't seen nothing yet." There was no testimony to make it clear to the court whether this was in fact a meeting of the board of Shadagee and the precise subject matter of the conversation. In the absence of some explicit context, the court is uncertain as to the implications of that testimony.

14

Mr. Tisdale considered the ARCH Beta notice of termination to be within the 60-day provision and therefore valid. However, as of the date of this decision, no conclusion has been reached by the Board of Directors of ARCH Beta as to their intentions. The budgeted revenues from the ARCH Beta project is $137,371.

It would appear from the evidence that there have been four terminations resulting from the activities of the defendants representing a total of anticipated and budgeted revenue of $285,357. This represents 27% of the total budgeted revenue of $1,049,903. However, of the amount terminated, independent circumstances have arisen according to the testimony of the owner of Forest Green making questionable the culpability of defendants in the termination of that contract. That represents $42,868.

Mr. Tisdale makes it clear that he recognizes the right of his clients to terminate their contracts in accordance with the written provisions, and quite properly so. Those terminations to a large extent could be in December of 2003, although they could be as late as June 2004. There was no evidence to remove sheer speculation on the part of the court as to whether those clients would be satisfied by the performance of the plaintiff during the remainder of the terms of those contracts such that they would be unaffected by the termination of defendants and the defendants' conduct. Under the circumstances, the court concludes that the present impact upon the business of the plaintiff by the conduct of the defendants is a direct effect of approximately one-quarter of plaintiff's anticipated revenues for the fiscal year 2003.

Any issues of conduct of Mr. Tisdale and the defendants with regard to the Maine Revenue Service levy are not before this court at this stage of the proceedings. While claimed losses by the plaintiff may be affected by the levy, this court reaches no conclusion with respect to the legitimacy of Mr. Tisdale's plan for use of a Florida management corporation or the defendants' concern of their involvement and exposure

16

to the Maine Revenue Service. The conclusion is simple: a legitimate disagreement arose with each party being satisfied of the right to their position and the correct and ethical conclusion was for termination of the employment relationship.

The court is not satisfied that the fact of the Maine Revenue Service levy is confidential information. The law is clear, as plaintiff has fully and clearly substantiated, individual tax returns and the information contained therein are fully confidential and protected but the law does not spell out the confidential status of a levy. The notice of levy is not marked "confidential" and it is not addressed to any specific person but to a corporation and, more specifically, to the attention of "accounts payable." A corporation may have an individual owner who handles all accounts payable or a large staff of employees responsible for accounts payable. Consequently, in the absence of some specific instructions otherwise, the taxpayer has no expectation of privacy and confidentiality with respect to the levy. The court cannot conclude that it is a violation of either the employment contract or the terms of employment as spelled out in the employee handbook to maintain the confidentiality of the levy. However, in the competitive business context, it is extraordinarily sensitive information when service contracts are involved. To the extent the disclosure of the levy is made in the context of "problems" such as "financial problems," "tax problems" or "problems with the Maine Revenue Service" such as to imply a weakness in the ability of the recipient of the levy or the taxpayer to meet future contractual obligations, it represents disloyalty, breach of employee's duties, breach of duties of an officer of the business corporation, interference with contractual relations and a clear violation of the spirit of the employee contract and employee handbook.

While customer lists may, under certain circumstances, be considered confidential information, and even trade secrets, such a concept would not apply in the

17

instant case because all of the activities in service of the management agreements were conducted by the defendants on a personal basis and no other persons within the corporation, including its president and owner, had been providing such management and administrative services. In that regard, to the extent the clients were notified of the intentions of the defendants and responded by indicating a desire to retain the services of the defendants, no actionable conduct is presented. To the extent the defendants acquired skills and ability while in the employment of the plaintiff, they have a right to use and expand these capabilities once leaving the employ of the plaintiff. *See S.I. Handling Systems, Inc. v. Heisley, et al.*, 753 F.2d 1244 (3rd Cir.).

There is no evidence of direct solicitation by the defendants of the business of plaintiff's clients. Defendant Crowley explicitly told the clients that he could not solicit while in plaintiff's employ. That leaves an inference that he could solicit their business after leaving plaintiff's employ but the court will not imply disloyal wrongdoing through the use of a negative conclusion to positive statements. It is also clear that the defendants had a right to and were obligated to provide advice to the clients once the clients made known their desire. Their desire could include an interest in maintaining the personal working relationship of the defendants. However, defendants did not have a right to advise the clients to violate the terms of their contract. While there has been some suggestion that the provisions for termination in the contracts were ambiguous, the court does not find them to be so ambiguous as to suggest that the effective date and terms were subject to more than one interpretation, (except where contradictory as noted in footnote 2.)

The impropriety of defendants' conduct is difficult to understand since the solution to their predicament was so simple under the law and the terms of their employment. If they were going to leave the employment and commence a competing

18

business, it was their responsibility under the law to do nothing that would disrupt a level field of competition. They could have simply advised Mr. Tisdale that upon advising clients of their leaving the company, the clients had indicated a desire to terminate the contracts. This would have allowed Mr. Tisdale and the defendants to discuss, and receive competent professional advice, as to the rights of the clients vis-à-vis their management agreement. To the extent an agreement was subject to early termination, the intent to compete for that business would have been on the table and fully disclosed and within the duty of loyalties defendants had to the plaintiff. When failing to take that course of action, the plaintiff was put at a competitive disadvantage created by the wrongful conduct of the defendants. The question before the court at this stage of the proceedings is whether the plaintiff has an adequate remedy at law under these circumstances.

To the extent the defendants breached their contract of employment with the plaintiff, the standard remedy is money damages. To the extent the defendants slandered or otherwise committed libel, by innuendo or otherwise, with regard to plaintiff's ability to meet the terms of future contractual obligations, the remedy is money damages unless the effect is of such magnitude as to suggest that financial remuneration is insufficient to provide complete relief. To the extent there is proven a tortious interference with a contract or an advantageous business relationship, there are standard remedies in money damages. To the extent the plaintiff lost key officers and employees who have succeeded in entering new arrangements with existing clients, the court, in using a "key man" analysis finds that money damages are sufficient under the circumstances, indeed, an employer can purchase insurance specifically to provide indemnification upon the loss of a key employee. All of plaintiff's pre-existing contracts were subject to termination within one year in accordance with their own provisions.

19

There is in evidence best estimates of anticipated revenue founded upon the proposed 2003 fiscal year budget which reduces speculation as to the foreseeable losses by the plaintiff solely caused by activities of the defendants.

The equities of the situation would suggest that the defendants should not benefit from their disloyal activities resulting in damage to the plaintiff. If money damages do not adequately provide a remedy to the plaintiff for the loss of one-quarter of its client base, what are the standards by which the court would create an equitable remedy? Should the defendants be enjoined from doing business with any former clients of the plaintiff? Should the defendants be enjoined from engaging in any business relationship with the four clients of plaintiff who have successfully terminated their contract? Should there be a time limit to the injunctive relief allowing the defendants to ultimately compete for the business of these former clients? Are there specific activities that should be enjoined and, if so, which activities and for how long? The damage is done to the level competitive marketplace. Is there an equitable remedy that can re-level that playing field without causing undue inequitable damage to the defendants?

The answers are elusive and subject to much speculation. The plaintiff has suffered a substantial blow to his client base but loss of 23% of the business is not irreparable and the performance by the plaintiff in the months remaining in the non-terminated contracts will play a very important role in the ability of the plaintiff to recover. For all these reasons, the court is satisfied that an appropriate equitable remedy is too speculative under these circumstances and there does exist adequate remedies at law for the damages suffered by the plaintiff. Those damages alone may well affect the ability of the defendants to compete with the plaintiff for future contracts.

However, there are two areas for which injunctive relief is imperative. Any activities by the defendants with regard to the nonprofit corporation HELPME must be enjoined. This transaction was clearly done on behalf of and by the efforts of the plaintiff and defendants should have no role or activity with respect to it. To the extent it is a transaction concluding the contracts of Waldoboro Woods, it is up to the plaintiff to complete that business. Secondly, defendant Crowley undertook an activity which was within the terms of his employment contract and the employee handbook and to which he claims a fee from the Augusta Regional Church Housing Organization. Failure to properly disclose and obtain the permission of the president of the plaintiff for such activity results in a requirement that he be enjoined from receiving that fee. It is the property of the plaintiff.

There are collateral issues raised by the plaintiff which must be addressed by the court in the interest of completeness. Plaintiff claims that the defendants were attempting to steal its employees and, indeed, a comment was made by defendant Crowley to an employee of plaintiff to the effect that he would be leaving and taking the employees with him. The court is satisfied this comment was made during the time when negotiations were going on between defendant Crowley and Mr. Tisdale on the purchase of plaintiff's business. Mr. Tisdale testified that a proposal on the table included a purchase by defendants of the corporate entity which would have resulted in the employees continuing to be employed by the corporation but the shares would be owned by the defendants. Since this was an issue, the court refuses to conclude that the comment was an indication of an intent on the part of the defendants to do harm to the plaintiff. To the extent there has been some suggestion that the defendants communicated an intent to steal plaintiff's contracts, the court finds no evidence of such

21

soliciting activity except the improper disclosure of "problems" on the part of plaintiff's shareholder.

It has been suggested that the advice and assistance of defendant Whitney in the preparation of termination letters wrongly included notice to HUD. The court notes that each of the contracts contain a provision of notification to the "Authority." The court is satisfied that regardless of the other provisions of termination, advance notice to the public authorities providing assistance to the projects was mandated.

There has been some suggestion that defendant Whitney engaged in improper financial transactions by making payments to an employee IRA account in the Spring when they were normally made in the Fall. The court accepts as reasonable defendant Whitney's explanation that she had made personal representations to the employees at the time the IRA was created that she would see that it was properly funded by the corporation and, having indicated an intent to terminate her employment, felt responsible to see that that funding took place prior to termination to the extent it was due at that time.

In sum and substance, plaintiff has clearly established by a preponderance of the evidence that defendants' wrongful conduct resulted in a loss of three management contracts for which it budgeted revenues of $242,489.00 for fiscal year 2003: Rangeley, Shadagee and ARCH Beta. It is entitled, at law, to be compensated for those losses.

For all these reasons discussed, the entry will be:

Plaintiff's motion for preliminary injunction is GRANTED IN PART; defendants shall not, individually or as employees of any person or entity, or as owners, managers or partners in any entity, offer to engage or engage in management of HELPME, a Maine nonprofit corporation; defendant Crowley shall, within 20 days, pay to plaintiff all sums

22

received as personal fees from ARCH Beta, not otherwise paid to the plaintiff corporation; defendants shall return to plaintiff any copies of any business records taken by them as employees of Dirigo, including but not limited to financial records in the possession of defendant Whitney; defendants are further ORDERED to make no statements or disclosures, to any person, in any context, including any information received by each of them as employees of Dirigo concerning the personal financial affairs of the sole shareholder of Dirigo in relation to plaintiff's activities or, based on any information acquired while employed by plaintiff, to impugn, in any fashion, the ability of plaintiff to perform its functions; the clerk is directed to place this matter on the trial calendar for trial on damages in accordance with this decision.

Dated: September ___ 24 ___, 2003

Donald H. Marden
Justice, Superior Court

DIRIGO HOUSING ASSOCIATES INC - PLAINTIFF

Attorney for: DIRIGO HOUSING ASSOCIATES INC
CHARLES MITCHELL
MITCHELL & DAVIS
86 WINTHROP STREET
AUGUSTA ME 04330

SUPERIOR COURT
KENNEBEC, ss.
Docket No   AUGSC-CV-2003-00156

**DOCKET RECORD**

vs
CHRISTOPHER CROWLEY  - DEFENDANT

Attorney for: CHRISTOPHER CROWLEY
PHILLIP E JOHNSON
JOHNSON & WEBBERT, LLP
160 CAPITOL ST
PO BOX 79
AUGUSTA ME 04332-0029

CATHIE WHITNEY  - DEFENDANT

Attorney for: CATHIE WHITNEY
PHILLIP E JOHNSON
JOHNSON & WEBBERT, LLP
160 CAPITOL ST
PO BOX 79
AUGUSTA ME 04332-0029

Filing Document: COMPLAINT                    Minor Case Type: CONTRACT
Filing Date: 07/03/2003

## Docket Events:

07/07/2003 FILING DOCUMENT - COMPLAINT FILED ON 07/03/2003
        Plaintiff's Attorney:   CHARLES MITCHELL
        WITH ATTACHED AFFIDAVITS OF PHYLLIS STULTZ AND ROBERT TISDALE, FILED.

07/07/2003 Party(s):  DIRIGO HOUSING ASSOCIATES INC
        ATTORNEY - RETAINED ENTERED ON 07/03/2003
        Plaintiff's Attorney: CHARLES MITCHELL

07/07/2003 Party(s):  DIRIGO HOUSING ASSOCIATES INC
        MOTION - TEMP RESTRAINING ORDER FILED ON 07/03/2003
        Plaintiff's Attorney:   CHARLES MITCHELL
        MOTION FOR TEMPORARY RESTRAINING ORDER WITH NOTICE; MEMORANDUM OF LAW IN SUPPORT OF
        PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PROPOSED ORDER, FILED.

07/07/2003 HEARING - TEMP RESTRAINING ORDER SCHEDULED FOR 07/09/2003 @ 9:00
        THE ABOVE DATE FOR HEARING WAS GIVEN TO COUNSEL FOR PLAINTIFF WHICH WAS INCORPORATED IN
        THE MOTION FOR TRO WHICH WAS FILED ON 7/3/03.

07/09/2003 Party(s):  DIRIGO HOUSING ASSOCIATES INC
        OTHER FILING - OPPOSING MEMORANDUM FILED ON 07/09/2003
        Plaintiff's Attorney:  PHILLIP E JOHNSON
        MEMORANDUM IN OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER WITH AFFIDAVIT OF
        RICHARD W. JENNEY, AFFIDAVIT OF CATHERINE WHITNEY AND AFFIDAVIT OF CHRISTOPHER CROWLEY.